**Martin L. WEIL, Plaintiff,**

v.

**DIVERSIFIED PROPERTIES, a limited partnership, et al., Defendants.**

**Civ. A. No. 342–69.**

United States District Court, District of Columbia.

Dec. 2, 1970.

Mark Friedlander, Washington, D. C., for plaintiff.

James F. Tomes, Silver Spring, Md., Milford Schwartz, Irving Yochelson, Washington, D. C., for defendants.

## MEMORANDUM OPINION

GESELL, District Judge.

This is an equitable action brought by the general partner of a limited partnership asking the Court to declare the limited partners general partners and for the appointment of a receiver and an accounting. The case raises some factual issues and presents legal questions under the Uniform Limited Partnership Act, 41 D.C.Code § 401, *et seq.*, apparently not previously determined in this jurisdiction. Testimony was taken on the issue whether the defendant limited partners became general partners and on the merits of two counterclaims filed by different limited partners.

Diversified Properties is a limited partnership organized effective January 2, 1967, with varying degrees of ownership in several garden-type apartments and other real estate located mostly in Maryland. A formal written agreement was signed in July 1967, and the partnership was duly registered in the District of Columbia under the provisions of the Code. The origins of the partnership are not in dispute. Weil had been managing and dealing in real estate and had varying participations in several properties. He needed capital and approached defendant Baer with a view to placing some of his real estate interests in a limited partnership to be formed. Baer, a CPA, had several clients looking for tax shelter and mainly through his auspices a group of limited partners was assembled and the agreement signed by all parties on the advice of various attorneys and backdated to January in order to get maximum depreciation and loss carry-over tax deductions. Weil was the only general partner.

All parties agree the limited partners remained strictly in that status until about May 1, 1968. By April, however, the partnership was hard pressed for cash, various mortgage obligations had to be satisifed or refinanced and the projected cash flow was very inadequate. Weil, who had been managing the prop-

erties from a partnership office at one of the apartment projects, looked for other employment and at a meeting of the partners on April 24 offered to discontinue his salary and close up the partnership office, steps which would effect a saving of something in the neighborhood of $75,000. This was a gloomy and revealing meeting. Weil's proposal was accepted with little consideration of what, if anything, Weil would do in the future. By the time of the next partnership meeting a week later, two individuals—Rubenstein and Tempchin—had been selected to manage one or more of the properties on a commission basis in accordance with a general proposal Weil had advanced. The partnership books and records had been transferred to Baer's office, the official business address of the partnership, and Weil commenced working for another real estate company as vice president. From then on the partners were involved in refinancing and meeting further capital demands. Although they put more money into the venture money pressures increased and the partnership remained very short of cash with early foreclosures threatening. All partners hoped to sell some properties and thus keep others afloat. Weil's name still appeared on various obligations which in fact had been assigned to the partnership. As general partner he had also naturally made numerous business commitments for the partnership. Creditors therefore turned to him with persistent demands for payment which could not be met. The limited partners had no obligation or willingness to come forward with still more capital sufficient to meet these demands.

It is against this general background that the activities and relationships of the partners must be analyzed in more detail. Weil argues that the limited partners took control of the enterprise within the meaning of D.C.Code § 41–407, which provides:

A limited partner shall not become liable as a general partner unless, in addition to the exercise of his rights and powers as a limited partner, he takes part in the control of the business.

Weil contends that after his withdrawal from a salaried position on May 1, 1968, he was supposed to continue as general partner, keeping an eye on the business; but that he was ignored. He claims that meetings of the other partners were held in his absence and without notice, and that Rubenstein and Tempchin not only refused to follow his instructions but took orders from the limited partners, particularly Baer, Kaye, Steinberg and Jerome Snider. He points to various isolated episodes suggesting interference by certain individual limited partners with matters Weil contends he should have handled as general partner. The limited partners by categorical testimony strenuously deny these charges and the over-all inferences that Weil seeks to draw from various incidents.

The only significant independent witness, Rubenstein, who was brought into the enterprise on the recommendation of Weil, had managed three properties for the partnership, had no detailed knowledge of the partnership operations and could testify mainly only to impressions. He did not follow intermittent suggestions or instructions from Weil concerning disbursement of the limited funds available. In the first place, there was not enough money. Also, he felt he should consult all partners because he was not sure of Weil's status. Throughout he had difficulty communicating with the other partners and also with Weil. It does appear that both Rubenstein and Tempchin had been told by Baer that they could consult him on any matters of business judgment, and they did this on occasion. Baer's office had the books and records. Under the agreement, Baer could sign checks and he had probably the best over-all understanding of the partnership's complex and somewhat uncertain obligations. Rubenstein also was occasionally in contact with Steinberg, Kaye, Jerome Snider and Weil. All limited partners categorically deny that they ever gave explicit orders or instructions to either Ruben-

stein or Tempchin. The partnership was not well managed by anyone, and existed mainly through improvisation from crisis to crisis. Rubenstein gave little concrete testimony as to any directions he received and Tempchin was not called to testify by either side. Most of the witnesses, including Weil, reconstructed the confusing events of the post-May period from the vantage of hindsight with a considerable element of self-interest.

Cases relating to whether or not limited partners have taken part in control of the business and are thus to be treated as general partners involve claims by creditors against the partners. *See, e. g.,* Plasteel Products Corp. v. Helman, 271 F.2d 354 (1st Cir. 1959); Gilman Paint & Varnish Co. v. Legum, 197 Md. 665, 80 A.2d 906 (1951); Rathke v. Griffith, 36 Wash.2d 394, 218 P.2d 757 (1950). No case has been found where a general partner has invoked Section 7 of the Act against his own limited partners. The purpose of Section 7 is to protect creditors:

> The Act proceeds on the assumption that no public policy requires a person who contributes to the capital of a business, acquires an interest in its profits, and some degree of control over the conduct of the business to become bound for the obligations of the business, provided creditors have no reason to believe that when their credits were extended that such persons were so bound. (William Draper Lewis, 65 U.Pa.L.Rev. at 715 (1917)).

Abendroth v. Van Dolsen, 131 U.S. 66, 9 S.Ct. 619, 33 L.Ed. 57 (1889) although decided under a New York statute which preceded the Uniform Partnership Act, is closely in point:

> [T]he statute, in fixing this liability on account of non-compliance with its provisions, does not change his special partnership into a general one, but simply makes him liable as a general partner to creditors. All his relations to his copartners, and their obligations growing out of their relation to him as a special partner, remain

unimpaired. 131 U.S. at 73, 9 S.Ct. at 623.

██ The remedy of a general partner who faces interference from his limited partners is to dissolve the partnership under Section 31 of the Uniform Partnership Act, 41 D.C.Code § 330. So long as the partnership continues, he is in a relationship of trust with his colleagues. Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545 (1928). He may not invoke the provisions of the Act to enlarge the liability of his partners.

██ Even if a general partner *might* hold his limited partners to account as general partners under certain circumstances, Weil cannot do so on the facts of this case. Weil considers himself still a general partner and recognizes that the written partnership agreement by its terms is a bona fide limited partnership under the Code. As between themselves, partners may make any agreement they wish which is not barred by prohibitory provisons of statutes, by common law, or by considerations of public policy. *See* Lanier v. Bowdoin, 282 N.Y. 32, 24 N.E.2d 732 (1939). Whatever may be the obligations of the limited partners as against creditors or third parties, Weil may not prevail against them if they have not breached the terms of the agreement. Having entered into the partnership agreement with advice of counsel, an agreement made largely for his own benefit in a field where he was especially experienced, he is bound by its terms. Accordingly, the initial inquiry must be to determine whether the limited partners have in any way violated the terms of the written agreement.

Paragraph 11 of the Diversified Properties agreement (plaintiff's exhibit 4) provides in pertinent part as follows with respect to the management of the business of the partnership:

> *Management of Business.* The day-to-day management of the business of this partnership shall be conducted by the general partner through whatever entity the partnership by

majority vote decides to establish. No limited partner (in his or her capacity as a limited partner) shall have or exercise any rights in connection with the day-to-day management of the partnership business. The general partner, so long as Martin L. Weil is the general partner, shall receive from the partnership and/or the entity established by the partnership to manage the business of the partnership, the total sum of Thirty-five Thousand ($35,000.00) Dollars per year as salary, and he shall in turn manage all of the partnership properties. All decisions which are not in the normal day-to-day course of business shall be made by the partnership and with respect to any such decisions, and except as is herein provided, a majority vote shall govern. * * * The refinancing or sale of any property shall require a majority vote of Class "A" limited partners only.

Thus it is apparent that the partners contemplated the general partner would receive a substantial salary and have the day-to-day management of the properties. For reasons already suggested, this expectation was altered by events which resulted in the general partner foregoing his salary and turning over immediate day-to-day responsibility to Rubenstein and Tempchin,[1] who were employed on a commission basis. After May 1, 1969, the partnership operation became a matter of salvaging what could be salvaged in the enterprise as it then existed. This naturally involved refinancing and sale of properties and other matters not in the normal course of day-to-day business. As to these non-routine matters, the limited partners by the very terms of their agreement had a majority vote, and were certainly authorized to comment upon them. Weil believes he should have had exclusive say as to how and what bills were to be paid with any money available beyond immediate operating needs, but under the prevailing conditions this clearly was not a normal day-to-day business question; it involved the very ability of the enterprise to survive. Moreover, the funds coming in were far from sufficient to meet current obligations, and no partnership account was being accumulated.

■ A limited partner under the Code has the right to require that the books and records be kept at a designated place for inspection and copying and he may at any time demand "true and full information of all things affecting the partnership". 41 D.C.Code § 410. It is well established that just because a man is a limited partner in an enterprise he is not by reason of that status precluded from continuing to have an interest in the affairs of the partnership, from giving advice and suggestions to the general partner or his nominees, and from interesting himself in specific aspects of the business. Such casual advice as limited partners may have given to Rubenstein and Tempchin can hardly be said to be interference in day-to-day management. Certainly common sense dictates that in times of severe financial crisis all partners in such an enterprise, limited or general, will become actively interested in any effort to keep the enterprise afloat and many abnormal problems will arise that are not under any stretch of the imagination mere day-to-day matters of managing the partnership business. This is all that occurred in this instance.

The foregoing analysis is wholly consistent with the understanding that the partners had back in 1968. Plaintiff's exhibit No. 1, in evidence, is a letter from Steinberg, one of the limited partners, written to Rubenstein and Tempchin under date of October 14, 1968. The letter was composed by Weil and distributed to all of the partners. It will be recalled that Rubenstein and Tempchin were conducting the routine

---

1. Weil proposed Rubenstein but not Tempchin. However when the limited partners suggested Tempchin rather than Weil's new employer, whom Weil had recommended, he promptly agreed and visited the property with Tempchin to assist in the employment.

handling of rent collections and expenditures for the garden apartments then being operated by the partnership. As the letter discloses in more detail, Steinberg pointed out that while Rubenstein and Tempchin were expected to continue normal activities in leasing and managing the properties and payment of bills generated by the projects, major decisions involving new obligations, closing phases of the operation, etc., were beyond the scope of their responsibilities as property managers but were to be determined by policies set with the knowledge and consent of all the partners. While Weil points to this letter as demonstrating a taking-over by the limited partners of operating responsibility, it appears rather to emphasize the clear distinction that the partners themselves drew at the time between the normal leasing, managing and bill-paying as it related to the properties and the decisions not normal to the day-to-day operations which, under the agreement, were always the responsibility of all the partners. While, to be sure, the letter suggests that not all partners were being consulted, Weil failed to establish that his views could not be considered. Weil was employed in another business, creditors were harassing him, his affairs were in disarray and he could not always be reached. He was busy developing a proposal for sale of the properties. Steinberg called most of the meetings, which were held at Steinberg's home, and the major problems of the partnership were acted upon at these meetings to which Weil was invited. It appears that while he was invited to partnership meetings he often failed to attend and was not available for consultation.

 Weil has not by a preponderance of the evidence established any violation by the limited partners of terms of the agreement with him, which at the very most is all that Weil can complain of in his effort to have the limited partners declared general partners. Since the partnership agreement was not violated by the limited partners, Weil has no cause of action and his request for the appointment of a receiver and an accounting will be denied. The provisions of the Limited Partnership Act are primarily designed to protect creditors. So long as the provisions of the agreement were followed, no partner can complain. Weil's complaint is dismissed.

██ There remain for disposition two counterclaims. First, Harris and Driggs,[2] two limited partners, assert that by reason of a written undertaking made between them and Weil on July 17, 1967, at the time they entered the partnership, they are entitled to an indemnification from Weil or, alternatively, from the other limited partners on the theory that the limited partners became general partners. The latter contention has already been disposed of and the only remaining questions in this counterclaim are whether the indemnification agreement can be said to be an obligation of the partnership or an obligation of Weil. The one-page agreement in question is ambiguous. Indeed, it appears in the record in two different forms and it is not even clear which of the agreements is the actual agreement. By its terms it would appear to be an obligation of Weil personally, but Harris, Driggs and Weil all suggest the undertaking was in reality an undertaking by Weil on behalf of the partnership. Even if its terms were clear and not ambiguous and an agreement of the partnership had been fully proven, however, it cannot be brought home against the partnership. Such an indemnification was contrary to the spirit of the partnership agreement, and the three signers failed to bring it to the attention of the other partners with whom they were in a position of trust. An enforceable contract was not proven. This counterclaim will be dismissed.

██ The other counterclaim is by some of the limited partners against

---

2. These limited partners were dismissed as defendants in the main action at the conclusion of plaintiff's evidence.

Weil on the theory he breached trust by bringing this action. There is no rule of law that denies the courts to a partner who mistakenly questions the conduct of his partners. This counterclaim is wholly without substance and will be dismissed.

The foregoing shall constitute the Court's findings of fact and conclusions of law. Submit promptly an order dismissing the complaint and counterclaims.